IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **GLENN MANSELL EZZARD,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | **No. 5:11-CV-505 (CAR)** |
| **EATONTON-PUTNAM WATER** | : | |
| **& SEWER AUTHORITY and** | : | |
| **TOM THOMPSON, Individually and** | : | |
| **in his Official Capacity as Member of** | : | |
| **the Board of the Authority,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This action arises from Plaintiff Glenn Mansell Ezzard's termination from his employment with the Eatonton-Putnam Water & Sewer Authority (the "Authority"). Plaintiff contends his termination violated the Age Discrimination of Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, as amended by the ADA Amendments Act of 2008, Publ. L. 110-325 ("ADA"); the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"); and 42 U.S.C. § 1983. Plaintiff also claims Defendants Tom Thompson and the Authority deprived him of equal protection, due process of law, and his right to privacy, for which he seeks relief under 42 U.S.C. § 1983. Finally, Plaintiff brings two state law claims for malicious prosecution and intentional infliction of emotional distress.

In response, Defendants filed the instant Motion for Summary Judgment [Doc. 14]. Having considered the parties' arguments, the record, and applicable law, Defendants' Motion for Summary Judgment [Doc. 14] is **GRANTED** as to Plaintiff's federal claims, and his state law claims are **DISMISSED without prejudice**.  Finally, Plaintiff's claims against Thompson in his official capacity under the ADEA, ADA, and FMLA, along with any attendant cause of action under Section 1983, are **DISMISSED** as redundant.

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."[1]  Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.[2]  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3]

In reviewing a motion for summary judgment, the Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party; the Court may not make credibility determinations or weigh the evidence.[4]  While the Court is not obligated to comb through the record in search of evidence, it is not limited to

---

[1] Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[2] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[3] *See id.* at 249-52.

[4] *See id.* at 254-55; *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

those pieces of evidence the parties have singled out for attention.[5]   The moving party "always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[6]   If the moving party discharges this burden, the burden then shifts to the nonmoving party to respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence creates a genuine issue of material fact or that the moving party is not entitled to a judgment as a matter of law.[7]

## BACKGROUND

For purposes of this Motion, the relevant facts in the light most favorable to Plaintiff, the non-movant, are as follows:

Defendant Eatonton-Putnam Water & Sewer Authority (the "Authority") was created by the Georgia General Assembly in 2005, supplanting the City of Eatonton's Water and Wastewater Department and acquiring the City's infrastructure.[8]   The Authority is governed by a five-member Board, whose members consist of elected

---

[5] *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."); *Clinkscales v. Chevron USA, Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987).

[6] *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).

[7] *See* Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324-26.

[8] *See* 2005 Ga. Laws (Special and Local Acts) 4090 at §2(a), Thompson Dep., Ex. P-1 [Doc. 19-2]; Pln. Dep., p. 39-42 [Doc. 17].

members of county and city governing authorities and their designees.[9]  Defendant Tom

Thompson served as Chairman of the Authority during the relevant events in this case.[10]

Plaintiff began his employment with the Authority at the age of 72, when he was named

the Authority's first Director.[11]  He held this position until December 29, 2010, when three

Board members, including Thompson, voted to terminate his employment.[12]

Six months before Plaintiff's termination, on June 15, 2009, while Thompson and

his wife were out of town, an anonymous caller reported dirty water at Thompson's

residence, 103 Highway 44.[13]  Thompson was not an Authority customer; the water to his

residence and farm was supplied by wells.[14]   Nonetheless, Plaintiff directed two

Authority employees to follow up on the anonymous complaint the next day.[15]  The two

employees took a water sample from a spigot under Thompson's kitchen window.[16]

Based on an analysis of the sample, Plaintiff concluded it was treated water, not well

water.[17]  Plaintiff later told the Eatonton Police Chief that "Tom Thompson was stealing

water and [he] had proof."[18]

When Thompson returned home on June 29, 2009, he discovered Authority crews

---

[9] 2005 Ga. Laws (Special and Local Acts) 4090 at § 2(b), Thompson Dep., Ex. P-1.
[10] Thompson Dep., p. 19 [Doc. 19-1].
[11] *See* 2005 Ga. Laws (Special and Local Acts) 4090 at  §2(a), Thompson Dep., Ex. P-1 [Doc. 19-2].
[12] *See* December 29, 2009 Minutes, Thompson Dep., Ex. P-19 [Doc. 19-11].
[13] Pln. Dep., pp. 133, 137.
[14] *Id.* at pp. 146-47.
[15] *Id.* at p. 134.
[16] *Id.* at pp. 134-35.
[17] *Id.*
[18] *Id.* at p. 131.

digging near another spigot next to his driveway.[19]   The same day, a crew performed a second test on a separate spigot, and the results were consistent with well water.[20] However, the Authority permitted Plaintiff to search Thompson's property for an illegal connection for two and a half to three months.[21]   Over the course of his investigation, Plaintiff found what he believed to be illegal cross-connections tying Thompson's property into Authority-controlled water sources.[22]   These events unsurprisingly sparked Thompson's ire and significant media coverage.[23]   Thompson promptly issued a statement vehemently denying Plaintiff's "slanderous, malicious, [and] politically-motivated charge."[24]   Plaintiff presented his final investigative report on October 14, 2009, standing by his conclusion that Thompson was illegally siphoning Authority water.[25]  There is no evidence in the record that the Authority pursued any kind of action against Thompson based on these findings.

       In the midst of Plaintiff's water theft investigation, the Authority turned its attention to other pressing matters: namely, an outstanding Consent Order with the Georgia Environmental Protection Division ("EPD"), which the Authority inherited from

---

[19] *Id*. at 136; July 9th Article, Thompson Dep., Ex. P-6 [Doc. 19-3].
[20] Pln. Dep., pp. 152-53.
[21] *Id*. at 140.
[22] *Id*. at 132, 144-47.
[23] Thompson Dep., Exs. 6, 10, 11, 13, 21, 23, 24 [Docs. 19-3, -4, -12, -13].
[24] Thompson Statement, Thompson Dep., Ex. P-7 [Doc. 19-3].
[25] October 14, 2009 Minutes, Defs. Mtn., Ex. 4 [Doc. 14-4].

the City of Eatonton in 2005.[26]   The Consent Order directed the City to cure certain

deficiencies in public's drinking water.[27]   At the time the City entered the Consent Order,

the Little River Water Treatment Plant was a primary source of water for the City.[28]   By

2009, however, the Little River Plant was no longer a primary source of water for the

Authority, and the Authority did not want to spend an exorbitant amount of money to

bring it into compliance with the EPD Consent Order.[29]

Based on these circumstances, Thompson and several Authority Board members

questioned Plaintiff about closing the Little River Plant.[30]   Although Plaintiff agreed that

the Little River Plant had to be closed, he believed immediate closure was "a huge risk"

to the water system and supply.[31]   During a meeting on September 16, 2009, the Authority

voted to send a proposal to the EPD calling for closure of the Little River Plant on or

before September 16, 2011, and a reduction in its use in the interim.[32]   Accordingly, over

the course of his employment, Plaintiff reduced operations at the Little River Plant from

seven to five days a week, and from four operators to one.[33]

---

[26] September 16, 2009 Minutes, Defs. Mtn., Ex. 3 [Doc. 14-3].
[27] Consent Order, Defs. Mtn., Ex. 2 [Doc. 14-2].
[28] *See* Pln. Dep., pp. 59-63.
[29] *See id.* at 44-46, 48; Thompson Dep., p. 17.
[30] Pln. Dep., pp. 48, 49.
[31] Pln. Decl. ¶ 8 [Doc. 18-2].
[32] September 16, 2009 Minutes, Defs. Mtn., Ex. 3.  Defendants allege that in June of 2009 the EPD explicitly directed the Authority to close the Little River Water Plant or spend an excess of one million dollars in repairs.  Defendants' cited evidence does not support this allegation.  *See* Thompson Dep., p. 17.
[33] Pln. Decl. ¶ 9.  Defendants make much of Plaintiff's statements about the Consent Order during his deposition; however, Plaintiff has satisfactorily explained his confusion through his subsequent Declaration. Pln. Decl. ¶¶ 8-9.  Accordingly, the Court will not treat his later statements as it would a "sham affidavit."

Sometime in 2009, a flood damaged an intake line to the Little River Plant.[34]   The record does not specify if this event occurred before or after the Authority submitted its Little River Plant proposal to the EPD.   Regardless of the timing, however, Plaintiff decided to repair the line and committed to purchasing an excavator for $9,500 to complete the task in-house.[35]   The excavator was on loan to the Authority, but the owner offered to sell the equipment "at an excellent price."[36]   As Director, Plaintiff had the authority to make purchases up to $25,000 without Authority approval.[37]   Nonetheless, Plaintiff notified the excavator owner that he did not have the Authority's prior approval to purchase the excavator but would buy the equipment for his personal use if the Authority ultimately rejected the deal.[38]   Plaintiff independently provided the funds for the first payment on the equipment.[39]   When Plaintiff presented his bill to Thompson, Thompson refused to reimburse Plaintiff because Plaintiff had not received the Authority's approval to purchase the excavator.[40]   Despite Thompson's objection, the Authority ultimately approved the excavator purchase.[41]

In December of 2009, Plaintiff notified the Authority Board members and his

---

*See Johnson v. Louisville Ladder*, Civil Action No. 07-764-KD-M, 2008 WL 5122261, at *5 (S.D. Ala. Nov. 14, 2008) (citing *Clay v. Equifax, Inc.*, 762 F.2d 952 (11th Cir. 1985)).

[34] Pln. Dep., p. 85.

[35] *Id.*

[36] *Id.* at 86.

[37] Pln. Decl. ¶ 7.

[38] Pln. Dep., p. 86.

[39] Thompson Dep., p. 15.

[40] *Id.*; Pln. Dep., p. 86.

[41] *Id.* at pp. 15-16; Pln. Dep., p. 88.

employees that he was taking medical leave to have hip replacement surgery and would not be able to work again until January 11, 2010.[42]   Only eight months earlier, Plaintiff had returned to work after undergoing knee replacement surgery.[43]   When Plaintiff submitted his physician's note on December 4, 2009, the Authority's attorney notified Plaintiff that he was being placed on paid sick leave immediately and for the entirety of his leave.   The attorney also informed Plaintiff that his Assistant Director, Donna Archebelle, would serve as Interim Director in his absence.[44]   Despite being placed on sick leave, Plaintiff continued to work for several days after December 4th to prepare his employees and other matters for his absence.[45]   A few days later, an article in a local newspaper, *The Eatonton Messenger*, reported Plaintiff's age and pending hip replacement surgery.[46]   The next day, December 18, 2009, Plaintiff sent an email to the Authority's finance officer requesting FMLA leave in addition to his paid sick leave.[47]   Plaintiff submitted the request based on his physician's opinion that his recovery time would actually extend beyond January 11, 2010.[48]   At that time, Plaintiff had accrued over 400

---

[42] Pln. Dep., p. 119; December 1, 2009 Doctor's Note, Pln. Dep., Ex. 4 [Doc. 17-1]; Letter Approving Sick Leave, Pln. Dep., Ex. 5 [Doc. 14-6].

[43] Pln. Dep., p. 91.

[44] Letter Approving Sick Leave, Pln. Dep., Ex. 5.

[45] Pln. Decl. ¶ 14.

[46] December 17, 2009 Article, Thompson Dep., Ex. P-21 [Doc. 19-12].

[47] FMLA Email, Pln. Dep., Ex. 7 [Doc. 17-1].  There is no evidence in the record that Plaintiff provided the Authority any additional information, although the record does include a doctor's note stating that Plaintiff would be "[o]ut of work pending surgery schedule" beginning December 18, 2009.  December 18, 2009 Doctor's Note, Pln. Dep., Ex. 6 [Doc. 17-1].

[48] Pln. Dep., pp. 101-03.

hours of sick leave.[49]

Meanwhile, Authority Board members met to discuss their concerns about Plaintiff's performance in closed sessions held on December 3rd, 16th, and 29th of 2009.[50] Although Plaintiff knew there had been some "discussions, pro and con" about his investigation on Thompson's property, no one on the Board had informed Plaintiff that his job was in jeopardy.[51] Plaintiff was never "written up" or formally disciplined for any misconduct.[52] However, after returning to open session on December 29th, the minutes reflect as follows:

> Motion by Ms. [Hattie] Dunlap, seconded by Mr. [Powell] Griffith to reopen the meeting at 5:00 p.m. Motion by Mrs. Dunlap, seconded by Mr. Griffith, that [Plaintiff] be separated from his employment with the Eatonton Putnam Water & Sewer Authority effective December 29, 2009. All inquiries concerning the action of the Authority regarding [Plaintiff] are to be directed to legal counsel. Approved by Ms. Dunlap, Mr. Griffith, and Chairman Thompson, with Mr. Reid abstaining with no explanation due to personnel issues in closed session.[53]

The Authority attorney notified Plaintiff of the Board's decision by letter on December 30th, while Plaintiff was out on sick leave.[54] Plaintiff was replaced by his Assistant Director, Archebelle, a younger employee with no medical conditions. The Authority later reported to the Equal Employment Opportunity Commission ("EEOC") that the

---

[49] Letter Approving Sick Leave, Pln. Dep., Ex. 5.
[50] Thompson Dep., pp. 51-52; December Minutes, Thompson Dep., Ex. P-19 [Doc. 19-11].
[51] Thompson Dep., pp. 14, 17-18, 64; Pln. Decl. ¶ 7; Pln. Dep., p. 110-12.
[52] Pln. Decl. ¶ 2; Thompson Dep., p. 13.
[53] December Minutes, Thompson Dep., Ex. P-19.
[54] Pln. Decl. ¶ 14.

Board terminated Plaintiff because of his "questionable management decisions, ineffective approaches concerning compliance with a pending an [sic] EPD consent order and actions which could only be categorized at outright acts of insubordination."[55] The Authority highlighted Plaintiff's dealings with the Little River Plant, the excavator purchase, other expenditures, and his investigation on Thompson's property.[56]

## DISCUSSION

In his Complaint, Plaintiff asserts nine claims against the Authority and Thompson, in both his individual and official capacities, arising from Plaintiff's termination and various related events. In particular, Plaintiff asserts that Defendants terminated him for both discriminatory and retaliatory reasons in violation of the ADEA, ADA, and FMLA. Plaintiff also asserts Defendants deprived him of equal protection, substantive and procedural due process, and his constitutional right to privacy. Finally, Plaintiff brings two state law claims: malicious prosecution and intentional infliction of emotional distress.

First, the Court dispenses with certain claims against Thompson in his individual and official capacities. The Eleventh Circuit does not recognize individual capacity claims against state actors under the ADEA, ADA, or FMLA.[57] Rather, it is well settled in this circuit that public officials sued in their individual capacity do not qualify as "employers"

---

[55] EEOC Response, Thompson Dep., Ex. P-28 at 2 [Doc. 19-14].

[56] *Id.* at 2-3.

[57] *Smith v. Lomax*, 45 F.3d 402, 403 n.4 (11th Cir. 1995) (ADEA); *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996) (ADA); *Wascura v. Carter*, 169 F.3d 683, 687 (11th Cir. 1999) (FMLA).

for purposes of these statutes.[58]  Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiff's ADEA, ADA, and FMLA claims and any related Section 1983 claim against Thompson in his individual capacity.

Plaintiff's official capacity claims against Thompson are also improper.  Plaintiff asserts the same nine claims against both the Authority and Thompson in his official capacity.  Suits against an individual in his official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent."[59]  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."[60]  Accordingly, in a suit against both an entity and the entity's officer in his official capacity, the named officer should be dismissed as redundant.[61]  Thus, because the Authority is separately named as a defendant in this case, Plaintiff's claims against Thompson in his official capacity are **DISMISSED** as redundant.

Having dispensed with these preliminary issues, the Court addresses Plaintiff's remaining claims in turn.

## I.   Age and Disability Discrimination

Plaintiff claims the Authority terminated his employment because of his age (74)

---

[58] *Smith*, 45 F.3d at 403 n.4; *Mason*, 82 F.3d at 1009; *Wascura*, 169 F.3d at 687.

[59] *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978).

[60] *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

[61] *See, e.g., Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (nothing that it is appropriate for courts to dismiss named defendants in their official capacities as "redundant and possibly confusing to the jury").

and disability (hip replacement surgery) in violation of the ADEA and ADA.  The ADEA prohibits employers from discharging an employee who is at least 40 years of age because of the employee's age.[62]   The ADA prohibits covered employers from discriminating on the basis of known physical or mental impairments of a qualified individual with a disability.[63]   Both the ADEA and ADA require the plaintiff to demonstrate that his employer would not have taken an adverse action "but for" the plaintiff's protected status.[64]   In other words, a plaintiff's age and discrimination claims "cannot succeed unless the employee's protected trait actually played a role in [the employer's decisionmaking] process <u>and had a determinative influence on the outcome</u>."[65]

In light of the ADA and ADEA's "but for" causation standards, the Authority contends Plaintiff has "pled away" his action by asserting multiple claims.  Specifically, the Authority cites the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*,[66] which eliminated "mixed motive" claims under the ADEA.[67]   In the wake of *Gross*, "[t]here is some argument among the courts about whether a plaintiff can simultaneously

---

[62] 29 U.S.C. §§ 623(a)(1), 631(a).

[63] 42 U.S.C. § 12112.

[64] *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009) (ADEA); *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1073-73 (11th Cir. 1996) (ADA).

[65] *See Gross*, 557 U.S. at 176 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

[66] 557 U.S. 167 (2009).

[67] *See id.*  Whether a mixed motive theory is cognizable under the ADA is still an open question in this circuit. While the Eleventh Circuit has not addressed the issue, several circuits have expanded the reasoning of *Gross* to the ADA because it contains very similar language.  *See, e.g.*, *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957 (7th Cir. 2010); *Bolmer v. Oliveira*, 594 F.3d 134 (2d Cir. 2010); *Ross v. Indep. Living Res. of Contra Costa Cnty.*, No. C08-00854 THE, 2010 WL 2898773 (N.D. Cal. July 21, 2010).

pursue claims under the ADEA and [some other anti-discrimination statute] regarding the same employment decision and must therefore elect between the two theories."[68] Neither the Supreme Court nor the Eleventh Circuit has addressed this issue, and the Court need resolve the matter today.  Each of Plaintiff's claims fails as a matter of law.

### A. Direct Evidence

A plaintiff may establish discrimination through direct, circumstantial, or statistical evidence.[69]   Plaintiff proffers what he believes to be both direct and circumstantial evidence of discrimination.   As direct evidence of the Authority's age discrimination, Plaintiff offers a statement Thompson made to *The Eatonton Messenger* on May 17, 2012.   Commenting about his own position with the Authority, Thompson informed the newspaper that he would not seek re-election as Chairman because it was "time to step aside and look to a younger generation for county leadership."[70]  The Court agrees with the Authority's contention that this statement is not direct evidence of age discrimination.

Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact without inference or presumption.[71]  "To qualify as direct evidence of discrimination, [the Eleventh Circuit] require[s] that a biased statement by a decision-

---

[68] *Moore v. Jefferson Cnty. Bd. of Educ.*, Case No. 10-3272, 2012 WL 3030109, at *7 n.3 (N.D. Ala June 11, 2012).

[69] *See, e.g., Apodaca v. Secretary of Dep't of Homeland Sec.*, 161 F. App'x 897, 899 (11th Cir. 2006) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)); *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1274, 1255 (11th Cir. 2007) (ADA).

[70] May 17, 2012 Article, Thompson Dep., Ex. P-29 [Doc. 19-14].

[71] *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989).

maker be made concurrently with the adverse employment event, such that no inference is necessary to conclude that the bias necessarily motivated the decision."[72]  "In other words, the evidence must indicate that the complained-of employment decision was motivated by the decision-maker's ageism."[73]  Accordingly, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age," constitute direct evidence of discrimination.[74]  An example of direct evidence would be a note stating, "Fire Plaintiff—he is too old."[75]

In this case, Thompson did not make an ageist remark in relation to Plaintiff or Thompson's termination decision.[76]  Thompson's statement, at most, requires the factfinder to infer Thompson individually acted with discriminatory animus.  More to the point, however, the relevant decisionmaker is the Authority's Board and its three voting members—Dunlap, Griffith, and Thompson.  Even if the Court assumes Thompson had an unconstitutional motive, the illegal motive of one member of a three-member body is insufficient to impute an unconstitutional motive to the Authority as a whole.[77]  There is no evidence any other Board members adopted Thompson's statement or sentiment. Therefore, the Court concludes Thompson's statement is not direct evidence of the

---

[72] *Williamson v. Adventist Health Sys./Sunbelt, Inc.*, 372 F. App'x 936, 940 (11th Cir. 2010); *see also Bass v. Bd. of Cnty. Comm'rs*, 256 F.3d 1095, 1105 (11th Cir. 2001).

[73] *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999).

[74] *Id.* (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990).

[75] *See Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1558 n.13 (11th Cir. 1988).

[76] *Standard v. A.B.E.L., Inc.*, 161 F.3d 1318, 1329 (11th Cir. 1998) ("[R]emarks … unrelated to the decisionmaking process itself are not direct evidence of discrimination.").

[77] *See, e.g., Mason v. Village of El Portal*, 240 F.3d 1337, 1340 (11th Cir. 2001).

Authority's intent.

## B. Circumstantial Evidence

Without direct evidence, Plaintiff must produce sufficient circumstantial evidence to establish he was terminated because of his age and disability.  As the Eleventh Circuit has noted, "[t]here is more than one way to show discriminatory intent using indirect or circumstantial evidence."[78]  Most commonly, however, the Court evaluates these claims using the burden-shifting framework set established in *McDonnell Douglas Corp. v. Green*.[79]

Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case, or "facts adequate to permit an inference of discrimination."[80]  Once the plaintiff establishes a prima facie case, he has created an inference of discrimination, and the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions.  The employer's burden is merely one of production; it "need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."[81]  If the employer meets this "exceedingly light" burden, then the inference of discrimination is erased, and the

---

[78] *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012).

[79] 411 U.S. 792 (1973); *see Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (ADA); *Sims v. MVM, Inc.*, 704 F.3d 1327, 1322 (11th Cir. 2013) (ADEA).

[80] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

[81] *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (quoting *Burdine*, 450 U.S. at 254-55) (quotation marks omitted).

15

burden shifts back to the plaintiff, who must show that the employer's proffered reasons were merely pretext for discrimination.[82]  Importantly, the ultimate burden of persuasion remains on the plaintiff all times.[83]

1.  *Prima Facie Case*

The elements of a prima facie case vary depending on both the type of discrimination an employee alleges and the theory the employee uses to prove his case.[84] To establish a prima facie case for employment discrimination under the ADA, Plaintiff must prove that he (1) is disabled; (2) was otherwise qualified to perform the job; and (3) was subjected to unlawful discrimination because of his disability.[85]  The Authority argues that Plaintiff cannot prove he was terminated "because of" his disability because at least two of the voting Board members were "unaware of the specific nature of medical condition."[86]  In opposition, Plaintiff states that he informed all of the Board members about his upcoming hip replacement surgery.[87]  For purposes of this Motion, the Court must view the facts in the light most favorable to Plaintiff as the non-movant.[88] Thus, the Court assumes that Plaintiff did, in fact, notify Thompson, Dunlap, and Griffith of his impending surgery, and the Authority's argument fails.  As the Authority does not

---

[82] *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

[83] *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

[84] *See, e.g., Benson v. Tocco*, 113 F.3d 1203, 1208 (11th Cir. 1997) (listing elements of prima facie cases for reduction in force claims).

[85] *Greensberg v. BellSouth Telecomms.*, 498 F.3d 1258, 1263-64 (11th Cir. 2011).

[86] Defs. Mtn. at 4.

[87] Pln. Decl. ¶ 13.

[88] *Welch*, 951 F.2d at 1237.

challenge the other two elements of Plaintiff's prima facie case—his disability or qualification to perform his job—the Court assumes, *arguendo*, that Plaintiff has met his burden under the ADA.

For his ADEA claim, Plaintiff must demonstrate that he (1) is a member of the protected group of persons over forty; (2) was qualified for his job; (3) was subjected to an adverse employment action; and (4) was replaced by a substantially younger person.[89] The Authority does not address any of these elements.  Instead, it contends that Plaintiff must also identify a similarly situated employee who was treated more favorably than Plaintiff to satisfy his prima facie case.  The Authority is incorrect.  A plaintiff need only show that he was replaced by someone substantially younger.[90]   In this case, Plaintiff asserts that he was replaced by Donna Archebelle, who is more than 20 years his junior.[91] Because the Authority does not challenge any of the other elements of Plaintiff's prima facie case, the Court again assumes, without deciding, that Plaintiff has met his burden under the ADEA.[92]

---

[89] *Chapman*, 229 F.3d at 1024; *Damon*, 196 F.3d at 1359.

[90] *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996); *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1003 (11th Cir. 1997) (holding that plaintiff aged 42, who was replaced by employee aged 39, met the "substantially younger" replacement requirement under the ADEA).

[91] Although unclear, Plaintiff may also proffer Archebelle as a similarly situated employee.  If so, the Court disagrees.  The quantity and quality of Archebelle's misconduct is not "nearly identical" to Plaintiff's. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).  Accordingly, the Court cannot compare the two for purposes of Plaintiff's discrimination claims without "confusing apples and oranges."  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008).

[92] Plaintiff also offers "additional evidence" of discrimination to establish his prima facie case, alleging three other workers in his protected class were also terminated in 2010.  Pln. Response at 7 [Doc. 18].  Although evidence of discrimination against other workers may be used to prove a prima facie case, mere speculation

## 2.  *Legitimate, Nondiscriminatory Reason for Termination*

Assuming Plaintiff has established prima facie cases for age and disability discrimination, the burden shifts to the Authority to "clearly set forth, through the introduction of admissible evidence, the reason for its adverse employment decision, and that reason must be legally sufficient to justify a judgment for the defendant."[93]   The Authority's burden is "exceedingly light"; an employer need only articulate a reasonable, non-discriminatory basis for its actions.[94]   The employer "need not persuade the court that it was <u>actually</u> motivated by the proffered reasons."[95]    In this case, the relevant decisionmaker is the Authority's Board; as such, the Court considers each voting member's reasons for terminating Plaintiff.

In an early Response to the EEOC, the Authority explained that the Board terminated Plaintiff because of his "questionable management decisions, ineffective approaches concerning compliance with a pending an [sic] EPD consent order and

and conjecture on the part of the plaintiff is no substitute for actual evidence, and cannot be relied upon to defeat a properly supported motion for summary judgment.  *See, e.g., Kiburz v. England*, 361 F. App'x 326, 336 (3d Cir. 2010) (citing *Acumed LLC v. Advanced Surgical Servs.*, 561 F.3d 199, 228 (3d Cir. 2009)).  An adverse effect on a few employees, is not sufficient to demonstrate discriminatory treatment.  *See, e.g., Pace v. Southern Railway Sys.*, 701 F.2d 1383 (11th Cir. 1983) (sample size of 12 was too small to be significant), *cert. denied*, 464 U.S. 1018 (1983).  Importantly, Plaintiff fails to show what percentage of the employee population was in the protected age group and/or disabled and what percentage was not.  In the absence of evidence as to the circumstances surrounding the Authority's decision to terminate these three other employees, the fact that workers of a particular age and with a particular disability were terminated does not support a finding of discrimination.  *See, e.g., Leopold v. Baccarat, Inc.*, 174 F.3d 261, 271 (2d Cir. 1999); *Fields v. J.C. Penny Co., Inc.*, 968 F.2d 533, 537-38 (5th Cir. 1992).

[93] *Walker v. Mortham*, 158 F.3d 1177, 1184 (11th Cir. 1998) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)) (internal quotation marks omitted).

[94] *Vessels v. Atlanta Ind. Sch.Syst.*, 408 F.3d 763, 769-70 (11th Cir. 2005).

[95] *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012).

18

actions which could only be categorized at outright acts of insubordination."[96]  The Response highlighted Plaintiff's dealings with the Little River Plant, the excavator purchase, other expenditures, and his water theft investigation at Thompson's property.[97]

Later, during discovery, Thompson stated that he voted to terminate Plaintiff because (1) he was concerned that Plaintiff bought a piece of equipment without prior approval; (2) Plaintiff did not carry out the Authority's directive not to spend money on the Little River Plant; (3) Plaintiff's attitude; and (4) Plaintiff's decision to work without a medical release from his doctor after returning from his knee replacement surgery in April of 2009.[98]  Thompson denied that the water theft investigation was one of the reasons for Plaintiff's termination.[99]

Like Thompson, Griffith explained that Plaintiff often made decisions on his own, without the Authority's approval.[100]  Specifically, Griffith stated that Plaintiff disagreed with the Authority and its engineers concerning the continued operation of the Little River Plant and took action to repair the facility contrary to the Authority's wishes.[101]  Griffith also took issue with Plaintiff's purchase of the excavator, which "put the Board in a position where we felt like we had to reimburse him."[102]

---

[96] EEOC Response, Thompson Dep., Ex. P-28 at 2.
[97] *Id.* at 2-3.
[98] *See* Thompson Dep., pp. 12-17,
[99] Thompson Dep., p. 18.
[100] Griffith Aff. ¶ 4.
[101] *Id.* at ¶ 5.
[102] *Id.* at ¶ 6.

Dunlap echoed many of the same concerns as her colleagues regarding Plaintiff's excavator purchase, working without a release to return to work, and his refusal to close the Little River Plant, adding that Plaintiff "ignored the advice of the engineers hired by the Authority, which exhibited poor judgment in my opinion."[103]  Dunlap also stated that her decision was based on (1) a lack of customer confidence due to delays in adding new customers; (2) Plaintiff's lack of management experience or skills; (3) his poor record-keeping; and (4) his insubordination toward Thompson.[104]

Because these are all reasons "that might motivate a reasonable employer,"[105] the Authority has satisfied its "exceedingly light" burden of producing legitimate, nondiscriminatory reasons for terminating Plaintiff's employment.

### 3.  *Pretext*

Because the Authority has articulated legitimate reasons for terminating his employment, Plaintiff must produce "significantly probative" evidence showing that these reasons are in fact pretext for discrimination.[106]  "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence.'"[107]   Here, Plaintiff attempts to prove pretext by showing the

---

[103] Dunlap Aff. ¶ 4.

[104] *Id.*

[105] *Chapman*, 229 F.3d at 1030.

[106] *Young v. Gen. Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1998) (internal quotation omitted).

[107] *Kragor*, 702 F.3d at 1308.

Authority's reasons are unworthy of credence.[108]   To that end, Plaintiff challenges the underlying facts supporting the Authority's reasons for his termination. Because the Authority has "proffer[ed] more than one legitimate, nondiscriminatory reason, the [P]laintiff must rebut each of the reasons to survive a motion for summary judgment."[109] He has not.

First, all of the voting Board members cited Plaintiff's decision to purchase the excavator without receiving their prior approval as a reason for his termination.   In opposition, Plaintiff claims he had the authority to make purchases up to $25,000 with or without the Authority's approval.[110]   Whether Plaintiff had the independent authority to purchase the excavator is not the relevant issue.  The critical inquiry is whether the Board members sincerely believed that Plaintiff should have sought their approval before he committed to the excavator purchase.  Indeed, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decisionmaker's head."[111]   Accordingly, the Board members' sincere belief "must be rebutted with evidence the [Authority's] belief of the occurrences is

---

[108] To the extent Plaintiff also cites Thompson's ageist statement to *The Eatonton Messenger* as circumstantial evidence of the Authority's discriminatory intent, the Court incorporates its earlier analysis.  As the Court previously explained, Thompson's personal statement is not probative of the Authority's intent.  Plaintiff also claims that a question posed by the Authority's attorney at his deposition regarding Plaintiff's interest in "still wanting to work at [his] age" is evidence that the Authority terminated his employment because of his age.  Pln. Response at 8 (quoting Pln. Dep., 160).  The Court will not merit this ludicrous allegation with a lengthy analysis.  Clearly, a question asked at a deposition over two years after Plaintiff was terminated is in no way probative of the Authority's discriminatory animus.
[109] *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).
[110] Pln. Decl. ¶ 7.
[111] *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

insincere or unworthy of credence."[112]

Plaintiff has not rebutted the Board's sincere belief; instead, his own actions validate it.  According to Plaintiff, he notified the excavator seller that he did not have the Authority's prior approval to make the purchase, but he would personally buy the excavator if the Authority disapproved.[113]   Because he did not seek preapproval, however, Plaintiff "put the Board in a position where we felt like we had to reimburse him."[114]   Consequently, Plaintiff has not rebutted the Authority's sincere belief that Plaintiff should have sought the Board's approval before purchasing the excavator and forcing its hand.

Second, Plaintiff fails to show that the Authority's decision to terminate Plaintiff's employment for working without a medical release after his knee surgery is unworthy of credence.   Plaintiff denies he worked without a release.   However, Plaintiff's own testimony proves otherwise.  The record contains a medical release dated April 24, 2009, releasing Plaintiff to return to work with restrictions on <u>May 4, 2009</u>.[115]  Plaintiff testified that he returned to work in <u>April of 2009</u>, meaning that he was, in fact, working without a release to light duty.[116]   To the extent Plaintiff claims Thompson demonstrated discriminatory animus by "questioning" his right to work with light duty restriction, the

---

[112] *Spann v. Cobb Cnty. Pretrial Court Servs. Agency*, 206 F. App'x 910, 912 (11th Cir. 2006) (citing *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769-70 (11th Cir. 2005)).

[113] Pln. Dep., p. 86.

[114] Griffith Aff. ¶ 6.

[115] Light Duty Release, Pln. Dep., Ex. 2 [Doc. 17-1].

[116] *See* Pln. Decl. ¶ 10.

Court finds this argument to be without merit.[117]   Thus, Plaintiff has not demonstrated that this reason was unfounded or pretext for discrimination.

Next, Plaintiff argues that the Authority's stated reasons are unworthy of belief because it has offered "shifting" or inconsistent reasons for his termination. In particular, Plaintiff points to the Authority's EEOC Response, which cites Plaintiff's investigation at Thompson's property as one of several reasons he was terminated.[118]   Later, Thompson denied that the investigation played a part in Plaintiff's termination.[119]   As a general rule, "an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext."[120]   To qualify as a "shifting reason," however, the employer's "new" reasons must plainly contradict the reasons articulated at the time of the decision.[121]   In this case, only Thompson has contradicted himself.  As the Court previously stated, Thompson's own inconsistent statements do not demonstrate that the other voting members of the Board acted with discriminatory animus or, in this context, pretext.   There is no evidence in the record that either Dunlap or Griffith adopted Thompson's statement.  Further, neither Board member has asserted mutually

---

[117] *See* Pln Decl. ¶ 10.

[118] *See* EEOC Response, Thompson Dep., Ex. P-28 at 2-3; Thompson Dep., p. 18.  Plaintiff also claims that the Board offered shifting reasons regarding his "insubordination."  However, none of the Board members have disclaimed that reason or offered another, contradictory reason for his termination.  In fact, Dunlap cites Thompson's insubordination in her affidavit.  Dunlap Aff. ¶ 4.

[119] Thompson Dep., p. 18.

[120] *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006).

[121] *See Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 935 (11th Cir. 1995) (noting that the "shifting explanation" of arguing that workplace attitude was the <u>only</u> reason for terminating the employee during trial proceedings, and then attempting to rely on health issues as a cause for termination on appeal, demonstrates that the new reasons are pretextual).

exclusive reasons for Plaintiff's termination or abandoned one reason in favor of another. Thus, the Court concludes that Plaintiff has failed to establish that the Authority has proffered "shifting" or inconsistent reasons for his termination.

In light of the foregoing, Plaintiff has failed to demonstrate that his age and/or disability was the "but for" cause of his termination.   Indeed, Plaintiff's own filings suggest the Authority terminated him because he investigated a possible water theft on Thompson's property.[122]   While Plaintiff may believe his termination was unfair, this Court does not sit as a "super-personnel department," and it does not review the wisdom of an employer's business decisions, no matter how mistaken or unfair they may seem, as long as the action was not for a prohibited discriminatory reason.[123]   For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiff's age and disability discrimination claims.

## II.   <u>Retaliation Claims Under the ADEA and ADA</u>

Curiously, Defendants failed to move for summary judgment as to Plaintiff's ADEA and ADA retaliation claims.  However, based on the foregoing analysis, the Court deems it appropriate to address the merits of these claims.  District courts unquestionably possess

---

[122] In his Response to Defendants' Motion for Summary Judgment, Plaintiff states that when he "set about trying to do his job investigating a legitimate complaint at his politically powerful Chairman's house, Defendants saw to it that [Plaintiff] was castigated in the press, fired at the age of 74 while on medical leave, and maliciously prosecuted for a nonexistent crime." Pln. Response at 8.
[123] *See Alvarez v. Royal Atlantic Dev., Inc.*, 610 F.3d 1253, 1266-67 (11th Cir. 2010).

the power to trigger summary judgment on their own initiative.[124]   Ordinarily, Federal

Rule of Civil Procedure 56 requires the Court to give the parties notice of its intent to act

before entering summary judgment.[125]   But the Eleventh Circuit has "distinguished

between *sua sponte* grants of summary judgment in cases involving purely legal questions

based on complete evidentiary records, and cases involving factual disputes where the

non-moving party has not been afforded an adequate opportunity to develop the

record."[126]   In other words, "where a legal issue has been fully developed, and the

evidentiary record is complete, summary judgment is entirely appropriate even if no

formal notice has been provided."[127]   This case satisfies those qualifications.

　　　Because the Court's holding is based on a predominant issue of law, and the record

on the issue is fully developed, the Court has the authority to enter summary judgment in

favor of Defendants.   Plaintiff received ample notice that the Authority intended to

challenge his claims by offering legitimate, nondiscriminatory reasons for its termination

decision.   Thereafter, Plaintiff had the opportunity to rebut those reasons by offering

probative evidence of pretext.   He failed to do so.   Assuming Plaintiff can establish a prima

facie case for both his ADEA and ADA retaliation claims, they fail under the same burden-

shifting framework as his discrimination claims for the same reasons outlined above.[128]

---

[124] *Celotex*, 477 U.S. at 326; *Burton v. City of Belle Glade*, 178 F.3d 1175, 1203-04 (11th Cir. 1999).

[125] *Massey v. Congress Life Ins. Co.*, 116 F.3d 1414, 1417 (11th Cir. 1997).

[126] *Artistic Entm't Inc. v. City of Warner Robins*, 331 F.3d 1196, 1201 (11th Cir. 2003).

[127] *Id.* at 1202.

[128] *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) ("[W]e assess ADA

Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's ADEA and ADA retaliation claims.

### III.   <u>Family Medical Leave Act</u>

The FMLA entitles an eligible employee to take up to twelve weeks of leave during any one-year period for medical reasons, including his own serious health condition.[129]  A person who avails himself of leave is entitled to be restored to his position or an equivalent position at the end of the leave without the loss of any benefits that had accrued prior to taking the leave.[130]  The FMLA provides two types of claims to enforce these rights: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act."[131]  Plaintiff appears to assert both a retaliation claim and an interference claim against the Authority; thus, the Court addresses both.

### A.  Retaliation Claim

Although unclear, Plaintiff seems to allege that the Authority retaliated against him for requesting FMLA leave by terminating his employment.  To establish a FMLA

---

retaliation claims under the same framework we employ for retaliation claims under Title VII."); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (noting that "the principles of law applicable to cases arising under very similar provisions of Title VII" apply to ADEA claims as well).
[129] 29 U.S.C. § 2615(a)(1).
[130] 29 U.S.C.  § 2614(a)(1).
[131] *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001) (citing 29 U.S.C. §2615(a)(1) & (2); 29 C.F.R. § 825.220(c)) (internal citations omitted).

retaliation claim, an employee must demonstrate that his employer discriminated against him because he engaged in activity protected by the Act.[132]   In the absence of direct evidence of an employer's intent, the Eleventh Circuit applies the same burden-shifting *McDonnell Douglas* framework.[133]   A plaintiff's prima face is made by showing: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity.[134]   The causal connection element is satisfied when a plaintiff shows that the protected activity and adverse action were "not wholly unrelated."[135]   Generally, "temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."[136]   Temporal proximity alone, however, is not sufficient to establish a causal connection when there is unrebutted evidence that the decisionmaker was not aware of the protected activity.[137]   In other words, "[a] decision maker cannot have been motivated to retaliate by something unknown to him."[138]

In this case, there is no question Plaintiff's FMLA request and his termination were close in time; the Authority terminated Plaintiff's employment only eleven days after he

---

[132] 29 U.S.C. § 2615(a).

[133] *Brungart v. BellSouth Telecomm. Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).

[134] *Id.*

[135] *Id.* at 799.

[136] *Id.*

[137] *Id.*

[138] *Id.*

submitted his FMLA request to the Authority's finance officer.  The pertinent question, then, is whether the decisionmaker, the Authority, was aware of Plaintiff's request for FMLA leave before deciding to terminate his employment.  As with Plaintiff's ADEA and ADA claims, Plaintiff must demonstrate that a majority of the voting Board members terminated him with an improper purpose.[139]  Even assuming Thompson knew about Plaintiff's FMLA request, Plaintiff has not rebutted Hattie Dunlap and Howell Griffith's testimony that they were unaware of Plaintiff's request.  Plaintiff asserts that Dunlap and Griffith were "Thompson's puppets" and "always anxious to do Mr. Thompson's bidding," but these unsubstantiated, conclusory assertions do not create a genuine issue of fact.  Without additional evidence, the Court cannot conclude Dunlap and Griffith shared any retaliatory motive Thompson held.[140]  Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiff's FMLA retaliation claim.

### B.  Interference Claim

 Plaintiff also asserts that the Authority interfered with his statutorily-protected right to take FMLA leave by terminating his employment while Plaintiff was out of work on paid sick leave.[141]  To state an interference claim, Plaintiff must demonstrate, by a preponderance of the evidence, that (1) he was entitled to a substantive FMLA right, and

---

[139] *Mason*, 240 F.3d at 1339.

[140] *See Gattis v. Brice*, 136 F.3d 724, 727 (11th Cir. 1998); *Hill v. Clifton*, 74 F.3d 115, 1152 (11th Cir. 1996).

[141] 29 U.S.C. § 2615(a)(1).

(2) the Authority denied him that right.[142]   Unlike a retaliation claim, Plaintiff does not

have to allege that his employer intended to deny the right; the employer's motives are

irrelevant to Plaintiff's prima facie case.[143]   However, the Authority may properly raise

lack of knowledge as a defense to Plaintiff's claim.

An employee does not have an absolute right to commence FMLA leave; thus, an

employer may successfully defend against a FMLA interference claim by demonstrating

that the employee would have been dismissed regardless of his request for leave.[144]

Accordingly, if the unrebutted evidence demonstrates that the decisionmaker terminated

an employee without knowledge of his request for FMLA leave, then, as a matter of law,

the termination was for other reasons than the FMLA leave, and the employee's

interference claim fails.[145]   Such is the instant case.   As the Court discussed above, there is

no genuine dispute as to Dunlap and Griffith's awareness of Plaintiff's FMLA request.

Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiff's

FMLA interference claim.

## IV.   Equal Protection Claims

Plaintiff asserts two equal protection claims under 42 U.S.C. § 1983: one predicated

on his claims under the ADA, ADEA, and FMLA; the other predicated on the "class of

one" theory.   In support of his first claim, Plaintiff contends that "[e]qual protection

---

[142] *Martin v. Brevard Cnty. Public Schs.*, 543 F.3d 1261, 1266-67 (11th Cir. 2008).

[143] *Id*. at 1267.

[144] *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010).

[145] *Id.*

discrimination claims are to be analyzed under the same principles as the federal nondiscrimination laws which Defendants' actions violate."[146]   If the Court accepts Plaintiff's interpretation of Section 1983, his claim fails under the same analysis articulated above.   As such, Defendants' Motion for Summary Judgment is likewise **GRANTED** as to this claim.   However, the Court notes that it has more fundamental misgivings about Plaintiff's allegations.   In *Holbrook v. City of Alpharetta, Georgia*,[147] the Eleventh Circuit held that a plaintiff may not assert a Section 1983 claim in lieu of or in addition to an ADA claim based on the same misconduct because "the ADA provide[s] extensive comprehensive remedial frameworks that address every aspect of [a plaintiff's] claims under [S]ection 1983."[148]   Although the Eleventh Circuit has not ruled on this issue in the context of the ADEA and the FMLA, the same rationale applies.[149]   Thus, if Plaintiff's ADA, ADEA, and FMLA claims had been successful, this Court would have dismissed his derivative equal protection claim.

For his second equal protection claim, Plaintiff asserts that Defendants singled him out from all other Authority employees by terminating his employment contrary to the Authority's progressive discipline policy.   This "class of one" claim is based on the

---

[146] Pln. Response at 13.

[147] 112 F.3d 1522 (11th Cir. 1997).

[148] *Id.* at 1531.

[149] *See, e.g.*, *Zombro v. Baltimore City Police Dep't*, 868 2d 1364, 1366-69 (4th Cir. 1989) (ADEA);  *Hayduk v. Cty of Johnstown*, 580 F. Supp. 2d 429, 480-86 (M.D. Pa. 2008).

Supreme Court's decision in *Village of Willowbrook v. Olech*.[150]  "In a 'class of one' equal protection claim … a plaintiff does not allege discrimination against a protected class or on account of membership in a particular group, but rater, asserts that he has been treated differently from others similarly situated for arbitrary or irrational reasons."[151] Since *Olech*, however, the Supreme Court has wholly rejected class of one claims in the context of public employment—such as the instant case.

In *Engquist v. Oregon Department of Agriculture*,[152] the Supreme Court held that "a 'class-of-one' theory of equal protection has no place in the public employment context."[153]  The Supreme Court specified that, while "the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently," it has no application when "government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner."[154] Consequently, "class-of-one equal protection claims are categorically prohibited in the public employment context."[155]

In this case, Plaintiff was employed as the Director of the Authority, which is a

---

[150] 528 U.S. 562 (2000).
[151] *Alford v. Consolidated Government of Columbus, Ga.*, 438 F. App'x 837, 839 (11th Cir. 2011).
[152] 553 U.S. 591 (2008).
[153] *Id*. at 594.
[154] *Id*.  at 605.
[155] *Alford*, 438 F. App'x at 839.

political subdivision of the State of Georgia.[156]  Thus, Plaintiff's public employment is not a valid basis for a "class of one" equal protection claim.  Accordingly, Defendants' Motion for Summary Judgment is also **GRANTED** as to Plaintiff's second equal protection claim.

## V.   <u>Substantive and Procedural Due Process Claims for Wrongful Termination</u>

Plaintiff also asserts that Defendants deprived him of due process by failing to follow the Authority's progressive disciplinary policy and terminating his property interest in continued employment.  The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."[157]  To that end, this clause provides two different kinds of constitutional protection: substantive due process and procedural due process.[158]  A violation of either may form the basis for a suit under 42 U.S.C. § 1983.  However, due process "is not a guarantee against incorrect or ill advised personnel decisions."[159]

To establish a procedural due process claim, a plaintiff must show (1) that he was deprived of a property interest (2) by state action and (3) he did not receive constitutionally adequate process.[160]  For purposes of this claim, Defendants concede that Plaintiff was deprived of a constitutionally protected property interest by state action

---

[156] Pln. Decl. ¶ 2; 2005 Ga. Laws (Special and Local Acts) 4090 at § 2(a), Thompson Dep., Ex. P-1.
[157] U.S. Const. amend. XIV, § 1.
[158] *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994).
[159] *Lee v. Hutson*, 810 F.2d 1030, 1032 (11th Cir. 1987).
[160] *Ross v. Clayton Cnty., Ga.*, 173 F.2d 1305, 1307 (11th Cir. 1999).

when the Authority terminated his employment without notice, a hearing, or opportunity to appeal.   However, Defendants assert that Plaintiff's procedural due process claim is barred because he failed to take advantage of an adequate state court remedy.  The Court agrees.

The Fourteenth Amendment protects against the government depriving an individual of his liberty or property without procedural due process.[161]  Deprivation is not complete, however, "unless and until the State refuses to provide due process."[162]  In other words, if state courts, upon request, would provide an adequate remedy for the procedural deprivation plaintiff claims to have suffered, then there is no federal procedural due process violation, even if the plaintiff failed to take advantage of the state remedy.[163]  This rule "recognizes that the state must have the opportunity to remedy the procedural failings of its subdivisions and agencies in the appropriate fora … [such as] state courts before being subjected to a claim alleging a procedural due process violation."[164]   In this context, the Eleventh Circuit has found that Georgia's writ of mandamus statute, O.C.G.A. § 9-6-20, provides a constitutionally adequate remedy for due process violations by state actors.[165]

---

[161] *See generally Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972).

[162] *Zinermon v. Burch*, 494 U.S. 113, 126 (1990); *see also McKinney*, 20 F.3d at 1557 ("[O]nly when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under § 1983 arise.").

[163] *Horton v. Bd. of Cnty. Comm'rs*, 202 F.3d 1297, 1300 (11th Cir. 2000).

[164] *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000).

[165] *Id*. at 1333.

Georgia law entitles a party to seek a writ of mandamus when "no other specific legal remedy is available[,] and a party has a clear legal right to have a certain act performed."[166]   The writ may be used to compel a government body, such as the Authority, to act in compliance with the law, "for instance, to require a governmental board to hold a hearing as provided by law."[167]   Thus, if Defendants terminated Plaintiff's employment without notice, a hearing, or opportunity to appeal, Plaintiff was entitled to seek a writ of mandamus to remedy this deprivation.  There is no evidence in the record that Plaintiff sought any such remedy in state court.  Therefore, Plaintiff's failure to pursue a writ of mandamus bars his procedural due process claim.[168]   Plaintiff's conclusory assertion that mandamus would not be an adequate remedy is not supported in fact or law; thus, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's procedural due process claim.

In addition to his procedural due process claim, Plaintiff asserts that Defendants violated his substantive due process rights by depriving him of his right to employment. However, the Due Process Clause of the Fourteenth Amendment only protects those rights that are "fundamental," that is, rights that are "implicit in the concept of ordered liberty."[169]   Fundamental rights are those which arise out of the Constitution, such as the

---

[166] *Cochran v. Collins*, 253 F. Supp. 2d 1295, 1305 (N.D. Ga. 2003); *see also* O.C.G.A. § 9620; *Acree v. Walls*, 240 Ga. 778, 784 (1978),

[167] *Cochran*, 253 F. Supp. 2d at 1305.

[168] *See, e.g., Cotton*, 216 F.3d at 1331.

[169] *McKinney v. Pate*, 20 F.3d 1550, 1560 (11th Cir. 1994) (en banc).

rights enumerated in the Bill of Rights and certain unenumerated penumbral rights. [170]

"Because employment rights are state-created rights and not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection."[171]  Thus, a deprivation of Plaintiff's state-created property interest in continued employment does not, without more, state a substantive due process violation.[172]  Accordingly, Defendants' Motion to Dismiss is **GRANTED** as to Plaintiff's substantive due process claim.

## VI.   Substantive Due Process Claim for Invasion of Privacy

Next, Plaintiff asserts that Defendants deprived him of his right to privacy by disclosing his age and impending hip replacement surgery to *The Eatonton Messenger*.  In opposition, Defendants claim that even if they did release this information their act does not rise to an unconstitutional level because disclosure would not "shock the conscience" of a federal judge.[173]  In opposition, Plaintiff cites *Griswold v. Connecticut*[174] for the proposition that his "§ 1983 cause of action for violation of his right to privacy is well-established."[175]  He offers no other support for this argument, which spans a mere three sentences.  Having carefully considered this question, the Court concludes that if a right to informational privacy exists at all, it does not extend to the type of information

---

[170] *Id.* at 1556.
[171] *Id.* at 1560.
[172] *Id.* at 1557 & n.9, 1560; *accord Bussinger v. City of New Smyrna Beach, Fla.*, 50 F.3d 922, 925 (11th Cir. 1995).
[173] *White v. Lemacks*, 183 F.3d 1253, 1259 (11th Cir. 1999).
[174] 381 U.S. 479(1965).
[175] Pln. Response at 15.

35

disclosed and disseminated in this case.[176]

As noted in the previous section, Fourteenth Amendment rights are narrowly construed, limited to those rights which are "fundamental" or "implicit in the concept of ordered liberty."[177]   While Fourteenth Amendment protection does encompass certain penumbral rights, Plaintiff's penumbral right to privacy is not clearly defined by the binding precedent on this Court—and potentially non-existent.[178]   Contrary to Plaintiff's assertions, the Supreme Court has not definitively recognized a constitutional right to informational privacy.[179]   In fact, the Supreme Court recently noted in *National Aeronautics and Space Administration v. Nelson*[180] that "the Court has said little … on the subject of an 'individual interest in avoiding disclosure of personal matters[,]'" and while "[a] few opinions have mentioned the concept in passing and in other contexts[,]" "no

---

[176] The Court notes that Plaintiff's claim has another fundamental flaw: lack of supporting facts.  Plaintiff claims that Defendants revealed his personal information to *The Eatonton Messenger*, but there is no factual basis in the record for this assertion.  The article itself vaguely states that certain "officials" informed the *Messenger* of Plaintiff's age and impending hip replacement.  December 17, 2009 Article, Ex. P-21.  The only evidence connecting Defendants to this article is Plaintiff's self-serving, conclusory statement that Defendants disclosed this information.  Plaintiff offers no basis for his personal knowledge of this event, and the Court cannot find any foundation for his assertion in the record.  In fact, any number of "officials" could have provided Plaintiff's age and medical condition to the *Messenger*; Plaintiff told everyone "from the Board down to the people that worked there" that he was "going to have hip surgery."  Pln. Dep., 119:14-16; *see Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations [in an affidavit] without specific supporting facts have no probative value.").  Despite these factual failings, however, the Court will consider the legal basis for Plaintiff's claim; Defendants failed to address these factual shortcomings in the instant Motion, and the Court will not *sua sponte* act on this flaw.  *See Massey v. Congress Life Ins. Co.*, 116 F.3d 1414, 1417 (11th Cir. 1997).

[177] *Paul v. Davis*, 424 U.S. 693, 713 (1976).

[178] *See, e.g., Nat'l Aeronautics and Space Admin. v. Nelson*, 131 S. Ct. 746, 751 (2011).

[179] *See id.*

[180] *Id.*

other decision has squarely addressed a constitutional right to informational privacy."[181] Again, in *Nixon*, the Supreme Court declined to squarely address the issue.

While the Supreme Court has consistently avoided this privacy question, the Eleventh Circuit expressly recognizes two distinct spheres of protection within a constitutional "zone of privacy": (1) public disclosure of private matters; and (2) an individual's interest in making certain decisions, such as those relating to marriage, procreation, and contraception, free of governmental interference.[182]   In this case, Plaintiff's claim is predicated on the first sphere—public disclosure of private information.   The scope of this privacy right is "far from settled," but it does not indiscriminately cover all personal matters as Plaintiff suggests.[183]   Rather, the existence and extent of constitutional protections depends on the type of information involved and the individual's reasonable expectation that the information would remain confidential.[184]

To rise to the level of a constitutional claim, the information disclosed must be either extremely intimate in nature or the disclosure must be a flagrant breach of a pledge of confidentiality that was instrumental in obtaining the information.[185]   The personal information in this case fails to meet either standard.   First, there is no evidence in the

---

[181] *Id.* at 756.

[182] *Padgett v. Donald*, 401 F.3d 1273, 1280 (11th Cir. 2005).

[183] *Harris v. Thigpen*, 941 F.2d 1495, 1513 n.26 (11th Cir. 1991).

[184] *Whalen v. Roe*, 429 U.S. 589, 604 (1977); *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 465 (1977).

[185] *See Harris*, 941 F.2d at 1514 (addressing HIV-positive diagnoses); *James v. City of Douglas, Ga.*, 941 F.2d 1539, 1544 (11th Cir. 1991) (discussing confidential personal information).

37

record that Plaintiff revealed his age and pending surgery under a pledge of confidentiality.  On the contrary, Ezzard admits that he told everyone "from the Board down to the people that worked there" that he was "going to have hip surgery."[186]

More fundamentally, however, this is not personal information that merits constitutional protection.  Plaintiff's age is readily provided to, and available from, various sources.[187]  In addition, while a hip replacement procedure constitutes personal medical information, it does not carry the kind of social stigma that merits constitutional protection from disclosure.  The Eleventh Circuit and its sister courts generally extend constitutional protection to medical conditions or procedures that have an inherent potential to provoke discrimination, hostility, or intolerance.[188]  For example, in *Harris v. Thigpen*,[189] the Eleventh Circuit assumed, *arguendo*, that HIV-positive prisoners "enjoy some significant constitutionally-protected privacy interest in preventing the non-consensual disclosure of their HIV-positive diagnoses to other inmates, as well as to their families and other outside visitors."[190]  The *Thigpen* Court based its analysis on severe social and personal implications arising from HIV-positive status, including the

---

[186] Pln. Dep., p. 119.

[187] *See, e.g. Lambert v. Hartman*, 517 F.3d 433 (6th Cir. 2008) (holding that the plaintiff had no Fourteenth Amendment privacy interest in her name, home address, birth date, driver's license number, and social security number).

[188] *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 72 (2d Cir. 2011).

[189] 941 F.2d 1495 (11th Cir. 1991).

[190] *Id*. at 1513.

likelihood of harassment and psychological pressures.[191]   In contrast, Plaintiff's hip replacement surgery does not expose him to the kind of ostracism and intolerance an HIV-positive individual would encounter.   While the Court can assume that Plaintiff would have preferred to keep this procedure from the public at large, its disclosure does not violate his constitutional right to privacy.

Even if this Court were to assume, *arguendo*, that Plaintiff's age and hip replacement surgery merit constitutional protection, his claim would still fail.[192]   The Supreme Court has repeatedly emphasized that "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."[193]   In short, due process violations do not arise whenever a state actor causes harm; instead, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."[194]   Mere negligent conduct, therefore, does not reach the level of a constitutional violation.[195]   Indeed, even intentional wrongs or conduct that amounts to an intentional tort under state law "will

---

[191] *Id*. at 1515 (quoting *Doe v. Coughlin*, 697 F. Supp. 1234, 1237-38 (N.D.N.Y. 1988)).

[192] *See, e.g., Matson*, 631 F.3d at 76 (applying the "shocks the conscience" standard to informational privacy claim) (Straub, J., dissenting in part, concurring in part); *Rutherford v. Katonah-Lewisboro Sch. Dist.*, 670 F. Supp. 2d 230, 239-40 (S.D.N.Y. 2009) (same)

[193] *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).  This is particularly true in a non-custodial setting. *See Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373, 1377-78 (11th Cir. 2002); *White*, 183 F.3d at 1259 ("[S]tate and local government officials violate the substantive due process rights of individuals not in custody only when those officials cause harm by engaging in conduct that is arbitrary, or conscience shocking, in a constitutional sense, and that standard is to be narrowly applied.") (internal citation and quotation omitted).

[194] *Lewis*, 523 U.S. at 848-49.

[195] *Id*. at 849.

rise to the level of a substantive due process violation only if it also shocks the conscience."[196]

In this case, there is no evidence that Defendants intended to injure or humiliate Plaintiff by releasing his personal information to *The Eatonton Messenger*.  Moreover, there is no evidence that disseminating Plaintiff's age or hip condition could expose him to any kind of risk, let alone the kind of "extremely great risk of serious injury" contemplated by the Eleventh Circuit.[197]  Defendants' conduct, however ill-advised or inappropriate, does not shock the conscience in a constitutional sense.[198]  Accordingly, Defendants' Motion for Summary Judgment is likewise **GRANTED** as to Plaintiff's substantive due process privacy claim.

## VII.   State Law Claims

Having granted summary judgment on Plaintiff's federal claims, the Court must now determine whether it should exercise supplemental jurisdiction over the remaining state law claims.[199]  The Court may decline to exercise supplemental jurisdiction over non-diverse state law claims if:  (1) a claim raises a novel or complex issue of state law; (2) a state law claim substantially predominates over the claim or claims over which the district

---

[196] *Waddell v. Hendry Cnty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003).

[197] *Id.* at 1306.

[198] This Court is also cognizant of the Supreme Court's reluctance "to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992).  Thus, the Court must "exercise the utmost care" when it is asked to "break new ground in this field."  *Id.*

[199] *See* 28 U.S.C. § 1367(a).

court has original jurisdiction; (3) the Court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.[200]  In deciding whether or not to exercise supplemental jurisdiction over pendent state law claims under 28 U.S.C. § 1367(c), the Court also considers the interest of judicial economy, convenience, fairness to the litigants, and comity.[201]

Here, summary judgment is due to be granted as to all of the federal claims over which this Court has original jurisdiction.  "When the district court has dismissed all federal claims from a case, there is a strong argument for declining to exercise supplemental jurisdiction over the remaining state law claims."[202]  Having fully considered the matter, the Court concludes that Plaintiff's state law claims should be determined by the Georgia courts.  Thus, the Court finds it appropriate to decline to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c).

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. 14] is **GRANTED** as to Plaintiff's federal claims.  Plaintiff's federal claims against Thompson in his official capacity under the ADEA, ADA, and FMLA, along with any attendant cause of

---

[200] 28 U.S.C. § 1367(c).

[201] *See Palmer v. Hosp. Auth. of Randolph Cnty.*, 22 F3d 1559, 1569 (11th Cir. 1994).

[202] *Arnold v. Tuskegee Univ.*, 212 F. App'x 803, 811 (11th Cir. 2006) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)).

41

action under 42 U.S.C. § 1983, are **DISMISSED** as redundant.   The Court declines to

exercise supplemental jurisdiction over Plaintiff's state law claims, and thus, those claims

are hereby **DISMISSED without prejudice** to Plaintiff filing them in state court.

    **SO ORDERED,** this 27th day of September, 2013.

                        S/  C. Ashley Royal
                        C. ASHLEY ROYAL, CHIEF JUDGE
                        UNITED STATES DISTRICT COURT

BBP/ssh